**In re Jamie Jo FLACK, Debtor.**

**Bankruptcy No. 99–52376.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Sept. 2, 1999.

157

Stephen E. Schafer, Columbus, OH, for debtor.

Robert J. Morje, Columbus, OH, for creditor.

Amy L. Bostic, Columbus, OH, Chapter 7 Trustee.

Alexander G. Barkan, Columbus, OH, Assistant U.S. Trustee.

## MEMORANDUM OPINION
## AND ORDER

CHARLES M. CALDWELL,
Bankruptcy Judge.

This Memorandum Opinion and Order constitutes the findings of fact and conclusions of law on the Motion to Impose Sanctions Under 11 U.S.C. § 362(h) filed by the Debtor, Jamie Jo Flack ("Debtor"), and the Memorandum Contra filed by National Check Cashers ("Creditor"). The dispute between the parties involves the post-petition dishonor of a check drawn on the Debtor's account and post-petition collection efforts for which the Debtor seeks sanctions. Based upon a review of the pleadings, testimony, documents received into evidence, and statements of counsel, the Court has concluded that only a limited portion of the Creditor's actions constitute a willful stay violation. To understand the bases for the Court's decision, a summary of the history of the relationship between the Debtor and Creditor is necessary.

The Debtor is employed at The Ohio State University, earning approximately Twenty–One Thousand Dollars ($21,-000.00) per year. The Creditor is engaged in the business of providing payroll advance loans, with nine locations in the Columbus, Ohio, area. Typically, these transactions involve a loan based upon the receipt of a post-dated check for the amount of the loan, a loan origination fee, and interest. The Debtor testified that she had obtained commencing in December 1998, numerous biweekly payroll advance loans from the Creditor in the amount of Three Hundred Dollars ($300.00) each. She testified these transactions included finance charges in the amount of Forty–Five Dollars ($45.00) each, and estimated she paid on the payroll advance loans with the Creditor a total of Two Thousand Dollars ($2,000.00). On cross examination, the Debtor testified she was obtaining similar payroll advance loans from other entities, such as National Cash Advance and CheckSmart and the Creditor's other locations, that she was utilizing the proceeds of all of these loans to fund the loan payments, and without these loans her checks would bounce.

The payroll advance loan at issue in this case was made on March 5, 1999, at the Creditor's 4154 West Broad Street location. In exchange for a loan in the amount of Three Hundred Dollars ($300.00), the Debtor agreed to pay finance charges in the amount of Forty–Five Dollars ($45.00), and she issued the Fifth Third National Bank check number 436 in the amount of Three Hundred Forty–Five Dollars ($345.00), post-dated to March 19, 1999.

On or about March 8, 1999, the Debtor made her first visit to consult bankruptcy counsel, Stephen E. Schafer ("Mr. Schafer"). The purpose of this meeting was to explore the Debtor's financial options, including the filing of a bankruptcy; however, at that time the Debtor did not decide to file. A second meeting was held between the Debtor and Mr. Schafer on March 12, 1999, at which time she decided to file bankruptcy. The Debtor testified that during the course of the meeting she overheard speaker phone conversations Mr. Schafer had with personnel of the Creditor, National Cash Advance and CheckSmart. The gist of the conversations overheard, according to the Debtor, was that Mr. Schafer was in the process of preparing a bankruptcy petition, and that he had instructed her to close her checking account. On this basis, post-dated checks should not be cashed, and he would send follow-up information, i.e., the bankruptcy petition. The Debtor did not testify as to the names of the parties receiving these calls.

The Court was presented with a letter dated March 12, 1999 ("the letter"), signed by Mr. Schafer and addressed to the Creditor at its 4154 West Broad Street address and directed to the attention of "Steve Davis, Collections." Mrs. Shirley Schafer ("Mrs. Schafer"), the secretary to and wife of Mr. Schafer, testified that the letter was mailed on March 12, 1999, from the Co-

lumbus, Ohio, main post office to ensure it was received the next day. Similar letters were addressed to National Cash Advance and CheckSmart. In the letter, Mr. Schafer stated:

> This is to confirm our telephone conversation earlier today during which I advised you that I have been retained by the above-referenced Jamie Jo Flack *to file a chapter 7 bankruptcy for her.* As I explained to you, I have instructed Ms. Flack to close her checking account which will result in the dishonoring of the negotiable instrument you hold, a post-dated check, for payment of the most recent payroll advance loan you gave her. I requested you not attempt to negotiate the post-dated check *for the reason that you are now on notice she will be filing bankruptcy.* Any questions regarding this matter should be directed to my office. (emphasis supplied)

The Creditor's collection manager to whom the letter was addressed, Cary Carnes ("Mr. Carnes"),[1] testified that he does not recall talking to Mr. Schafer on March 12, 1999, or any other time, and that the letter was not received until on or about April 9, 1999. The record indicates that the Creditor has arranged for mail addressed to 4154 West Broad Street and its other locations to be forwarded to a post office box, as a tool to centralize the receipt of mail. At the hearing, the Court was presented with the Creditor's copy of the letter and its accompanying plain envelope, according to the Creditor. The envelope bears an incorrect, transposed address, shows that it was corrected manually by some unknown party, and bears forwarding information to the Creditor's post office box, dated April 8, 1999. Mrs. Schafer testified the letter was mailed in a window envelope rather than a plain envelope; however, she testified the plain envelope introduced into evidence by the Creditor was from Mr. Schafer's office and was

typed there. Mrs. Schafer testified that a plain envelope would not be used for such a letter, but she could only surmise that the plain envelope may have contained an unidentified amendment.

There is a significant variance in testimony on the existence of a March 12, 1999, phone conversation between Messrs. Carnes and Schafer and/or the date of the mailing and receipt of the letter. At the trial, Mr. Schafer did not introduce any internal or external contemporaneous record of a March 12, 1999, phone conversation, and did not introduce any internal contemporaneous log of documents mailed or a postal receipt verifying the date of mailing. The Court finds, however, based upon its opportunity to observe the demeanor of witnesses and assess their relative veracity and accuracy of recollection, that the testimony offered on behalf of the Debtor is more credible regarding the phone conversation. On the other hand, the Court finds more credible the testimony on behalf of the Creditor regarding the mailing and receipt of the letter. In sum, the Court finds that the March 12, 1999, conversation did take place as offered by the Debtor; however, the Court finds that delivery of the letter was delayed, in part due to the apparent transposition of the address on the envelope prepared in Mr. Schafer's office, and that the Creditor did not receive the letter until on or about April 9, 1999.

Mrs. Schafer testified that on March 17, 1999, she received a telephone call from a representative of CheckSmart regarding the similar letter mailed to them. The gist of the conversation was that in the absence of notification of an actual bankruptcy filing, their post-dated check would be presented for payment. This was brought to the attention of Mr. Schafer, who issued instructions to contact the Debtor for an immediate appointment to prepare a bankruptcy petition. According to Mrs. Schafer, when the Debtor was contacted she was

---

1. According to counsel for the Creditor, its employees use pseudonyms. Mr. Carnes uses the pseudonym, Steve Davis. This name appears on the letter addressed to the Creditor.

unable to come to the office on March 17, 1999, but an appointment was scheduled for the morning of the next day.

On March 18, 1999, at 10:39 a.m., a chapter 7 bankruptcy petition was filed by Mr. Schafer on behalf of the Debtor, and according to Mrs. Schafer, a copy of the petition was immediately faxed to a CheckSmart representative. A copy was not faxed to the Creditor. The Creditor, however, was scheduled on Schedule F— Creditors Holding Unsecured Nonpriority Claims utilizing the address on 4154 West Broad Street and directed to the attention of "Steve Davis." On March 27, 1999, the official notice of the bankruptcy was issued to all parties, including the Creditor, and the 4154 West Broad Street address was utilized. Mr. Carnes testified that the notice of filing was not received until on or about April 7, 1999. The Court received into evidence the Creditor's copy of the notice of filing and its envelope which bears the 4154 West Broad Street address and forwarding information to the post office box dated March 31, 1999. The Court finds, based upon its opportunity to observe the demeanor of witnesses and assess their relative veracity and accuracy of recollections, that the Creditor did not receive official notice of the bankruptcy filing until on or about April 7, 1999.

The Court notes that the receipt of the letter and the official notice of bankruptcy filing were also delayed by the forwarding process to the Creditor's post office box. Such delay, albeit unintentional, would have been eliminated had the Creditor informed its customers to forward correspondence directly to the post office box. On the other hand, this stay violation litigation may have been obviated by faxing a courtesy copy of the petition to all of the payroll advance creditors holding post-dated checks. This combination of error and lack of attention to detail by the Debtor, Mr. Schafer, and the Creditor led to the March 19, 1999, post-petition deposit of the post-dated check that was dishonored by Fifth Third National Bank on March 23, 1999.

The check was returned to the Creditor on Friday, March 26, 1999, and on Saturday, March 27, 1999, a Ms. Cindy Brown ("Ms. Brown"), a collector for the Creditor, attempted to reach the Debtor at the home of the Debtor's mother; however, there was no answer. Ms. Brown then attempted to call the Debtor at work that same day, but the voice mail recording indicated that the office was closed until Monday, March 29, 1999. During the evening of Monday, March 29, 1999, Ms. Brown again attempted to call the Debtor at her job, and when she learned the Debtor was not there, left a message with the Debtor's supervisor that it was urgent the call be returned. That same evening the Debtor's supervisor left a voice mail message at the Debtor's home that an urgent phone call had been received and left the phone number, and the supervisor also left a similar message on the e-mail system.

On Tuesday, March 30, 1999, around 8:25 a.m., before going to work, the Debtor returned the call; however, she was informed by a gentleman, whose name she could not recall, that Ms. Brown did not work that day. The Debtor testified this unknown gentleman stated she owed the sum of Three Hundred Seventy Dollars ($370.00) for the returned check. The Debtor testified she responded that she had filed for bankruptcy, and her bankruptcy attorney, Mr. Schafer, should be contacted, who had talked to a representative of the Creditor several weeks before. The Debtor testified she also gave the unknown gentlemen Mr. Schafer's phone number. The Debtor testified the unknown gentleman inquired under which chapter she filed and whether Mr. Schafer had told her the filing of bankruptcy did not exempt her from paying for the check. The Debtor testified she responded such advice had not been given.

According to the testimony of Mrs. Schafer, before 9:00 a.m. on Tuesday, March 30, 1999, a Mr. Andy Stone ("Mr.

Stone") called.[2] Mrs. Schafer testified Mr. Stone stated checks could not be included in a bankruptcy, and she responded she would not argue the point but Mr. Schafer would call him. That same morning, according to Mr. Schafer's secretary who testified she could hear the conversation on the speaker phone, Mr. Schafer called Mr. Stone.[3] According to the testimony of Mr. Stone, it was not a pleasant conversation, but Mr. Schafer informed him a bankruptcy petition had been filed on behalf of the Debtor.[4]

Mr. Stone testified that the standard procedure for bankruptcies is to obtain the name and telephone number of the attorney, contact that attorney and ask them to fax a copy of the petition to be placed in the computer so all collection activity would cease. Mr. Stone testified he could not recall whether this procedure was followed when Mr. Schafer called. Mr. Stone testified that he told Mr. Carnes about the phone conversation with Mr. Schafer, but did not specifically communicate he was informed the Debtor filed bankruptcy. Instead, he merely made the entry in the computer system detailed above, indicating that information had been provided regarding a bankruptcy filing. Mr. Stone testified he had doubts whether Mr. Schafer was an attorney because of the tone of the conversation and because in the past calls have been received where parties have misrepresented their status as attorneys and the existence of a bankruptcy filing.

On cross examination, Mr. Stone denied that he talked to the Debtor on Tuesday, March 30, 1999. The Court does not know whom from the Creditor talked to the Debtor on Tuesday, March 30, 1999, but concludes based upon its assessment of relative veracity and credibility, that the conversation with the Debtor did take place, including the exchange regarding the impact of bankruptcy upon checks. This conclusion is confirmed by the content of Mr. Stone's conversation with Mr. Schafer as detailed in his own notes in the Creditor's computer system.

On Thursday, April 2, 1999, the Creditor issued a collection letter to the Debtor dated Wednesday, April 1, 1999. Mr. Carnes, the Creditor's Collection Manager, acknowledged the April 1, 1999, letter should not have been issued subsequent to the March 30, 1999, conversation between Messrs. Stone and Schafer; however, he opined that it was issued because there was no written documentation of the filing, and that there was some doubt Mr. Stone had talked to an attorney.

On the issue of damages, the Debtor presented testimony of Mr. John Cronin ("Mr. Cronin"), the Regional Security Manager for Fifth Third National Bank. On direct examination, Mr. Cronin testi-

---

2. Mr. Stone utilizes the pseudonym of Eric Davis, and serves as the Assistant Collections Manager for the Creditor.

3. According to the sanctions motion, the Debtor also contacted Mr. Schafer on Tuesday, March 30, 1999, regarding the phone conversation with the unknown gentleman, and gave him the phone number of the Creditor.

4. This conversation between Messrs. Stone and Schafer was memorialized in Mr. Stone's notes placed in the Creditor's computer system as follows:

    ATTY STEPHEN SCHAFER PH VERY RUDE SD HE CLD MAILD A LETTER TO NCC NOT TO DEPOSIT CK 1 ADV HE DOES NT HVE THE AUTHORITY TO TECLD LL NCC WHEN TO DEPOSIT CHECKS. *HE SD DEBTOR FILED CHAP 7 BKCY MAR 18, 1999 CASECLD # 9952376* –I ADV SHE IS STLL RESPONSIBLE TO PAY 4 THE CHECK OR WE CAN FILE CRIMINCLD AL CHARGES AGAINST JAMIE. SD HE WANTED TO TT MY SUPERVISOR. I ADV NO PROBLEM HE CACLD N CALL HIM BCK ON WEDNESDAY WHEN HE RETS (emphasis supplied)

    According to the sanctions motion, the conversation became so unpleasant that Mr. Stone hung up on Mr. Schafer, and Mr. Schafer had to call back twice to have Mr. Stone agree to leave a message for his supervisor, Mr. Carnes. Mrs. Schafer, who overheard this conversation, confirmed Mr. Stone hung up the phone.

fied that as a result of the dishonor of the post-dated check at issue, the Debtor had been entered into "Check Systems" and "Scan." According to Mr. Cronin, such entries would respectively preclude the Debtor from opening another bank account and/or cashing checks at stores. On cross examination, however, Mr. Cronin testified that at the time of the presentment of the post-dated check at issue, the Debtor's account already had a negative balance because of the presentment of an earlier check in the same amount. On direct examination, the Debtor testified that in order to attend the hearing on the instant stay violation, she lost a day's pay in the amount of Eighty Dollars ($80.00). On cross examination, the Debtor did express that she was concerned with the call to her work for fear that the fact of her filing would become known; however, she went on to testify that she is not aware that anyone at work knew. The Debtor testified she did not suffer any physical or financial injury as a result of the receipt of the collection letter, and subsequent to the April 1, 1999, letter, no further collection action has been taken.

■ The automatic stay provision of the United States Bankruptcy Code is an extremely valuable and fundamental element of a bankruptcy filing. Unfortunately, its significance is occasionally ignored and/or taken for granted, and bears periodic reiteration as follows:

> It is designed to effect an immediate freeze of the status quo by precluding and nullifying post-petition actions, judicial or nonjudicial, in nonbankruptcy fora against the debtor or affecting the property of the estate. The automatic stay plays a vital and fundamental role in bankruptcy. The stay ensures that all claims against the debtor will be brought in a single forum, the bankruptcy court. The stay protects the debtor by allowing it breathing space and also protects creditors as a class from the possibility that one creditor will obtain payment on its claims to the detriment

of all others. *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n*, 997 F.2d 581, 585 (9th Cir.1993); *accord, In re Hughes–Bechtol, Inc.*, 117 B.R. 890, 905 (Bankr.S.D.Ohio 1990), *aff'd* 144 B.R. 755 (S.D.Ohio 1992).

■ To preserve the integrity of the automatic stay provisions and to protect consumer debtors and creditors, Congress in 1984 enacted a mechanism to address stay violations as follows: "An individual injured by any willful violation of a stay ... shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h); *see generally* Arturo G. Hernandez, 11 U.S.C. § 362(h): *Congressional Answer to the Bankruptcy Abuse of Consumer Creditors*, 56 Ohio St.L.J. 617 (1995) (discusses the Congressional intent behind the enactment of the stay violation provision). Congress intended this provision to be liberally construed to fortify the protections of the automatic stay. *In re Sharon*, 234 B.R. 676, 687 (6th Cir. BAP 1999); *see generally*, Richard L. Stehl, *Eligibility for Damage Awards Under 11 U.S.C. § 362(h): The Second Circuit Answers the Riddle—When Does Congress Actually Mean What it Says?*, 65 St. John's L.Rev. 1119 (1991) (discusses the exclusive applicability of the stay violation provision to individuals and its legal significance).

■ To establish a willful violation, it must be shown that the party knew of the bankruptcy filing and then took some action, without regard to whether the party had specific intent to violate the stay or acted in good faith based upon a mistake of law or legal dispute regarding its rights. *In re Sharon* at 687–688; *In re Ramirez*, 183 B.R. 583, 589 (9th Cir. BAP 1995); *In re Bloom*, 875 F.2d 224, 226 (9th Cir.1989).

■ In stay violation litigation, debtors bear the burden of proof to establish by a preponderance of evidence the following elements:

(1) that a bankruptcy petition was filed,

(2) that the debtors are "individuals" under the automatic stay provision,

(3) that the creditors received notice of the petition,

(4) that the creditors' actions were in willful violation of the stay, and

(5) that the debtors suffered damages.

*In re Rainwater,* 233 B.R. 126, 155 (Bankr. N.D.Ala.1999).

■ Creditors in stay violation litigation bear the burden of proof by a preponderance of the evidence on any claimed defenses including:

(1) immunities,

(2) jurisdiction-denying doctrines, and

(3) inapplicability of the stay against the creditors' actions.

*In re Rainwater* at 155.

■ It is a debtor's responsibility to make sure that creditors have reasonable, actual notice of a pending bankruptcy case. *In re Smith,* 180 B.R. 311, 319 (Bankr. N.D.Ga.1995). Such knowledge does not have to come through formal means, and even if not scheduled, a willful violation may be established where the creditor has sufficient facts to cause, " . . . a reasonably prudent person to make further inquiry." *In re Clayton,* 235 B.R. 801, 807 (Bankr. M.D.N.C.1998); *In re Cepero,* 226 B.R. 595, 598 (Bankr.S.D.Ohio 1998). When reasonable, actual notice is received, it becomes a creditor's responsibility to ensure the stay is not violated, or if it has been prior to receipt of actual notice, to reverse any action taken. *In re Smith,* at 319. Where the stay is violated without knowledge that an active bankruptcy case is pending, it is considered a technical violation, and does not warrant the imposition of sanctions. *In re Clayton,* at 806; *In re Haan,* 93 B.R. 439, 440 (Bankr.W.D.N.C.

1988); *Commercial Credit Corp. v. Reed,* 154 B.R. 471, 475 (E.D.Tex.1993).

■ Pre-filing contact between a creditor and a debtor indicating that a bankruptcy may be filed has not been deemed sufficient to constitute actual notice for purposes of establishing a willful violation because, " . . . it must be emphasized that *it is the filing of a petition and not the debtor's intent to file* which invokes the automatic stay." *In re Bragg,* 56 B.R. 46, 48 (Bankr.M.D.Ala.1985) (emphasis supplied).[5] It has been held that, "The automatic stay was not designed to be used as a kind of spring-loaded gun against creditors who wander into traps baited by the debtor." *In re Clayton,* at 807.

■ Once the Court has found that there is a willful violation, the Debtor still must establish that there are actual damages, even though the damage provisions of section 362(h) of the United States Bankruptcy Code are mandatory. *In re Clayton,* at 810. Sanctions are not imposed for willful violations where the debtor has not been injured by issuance of collection correspondence. *In re Hamrick,* 175 B.R. 890, 893 (W.D.N.C.1994); *In re Brock Utilities & Grading, Inc.,* 185 B.R. 719, 720 (Bankr.E.D.N.C.1995); *In re Clayton,* at 810. Punitive damages are only awarded where creditors have demonstrated egregious, vindictive or intentional misconduct. *In re Clayton* at 810. The factors to be considered for the award of punitive damages include: the nature of the creditor's conduct, the creditor's ability to pay damages, the creditor's motives, and any provocation by the debtor. *In re Sumpter,* 171 B.R. 835, 844 (Bankr.N.D.Ill. 1994).

**5.** The Court declines to follow cases that may be interpreted as suggesting that in all instances pre-filing contact is sufficient to establish a willful stay violation. *In re Brooks,* 12 B.R. 283 (Bankr.W.D.Mo.1981); *In re MacDonald,* 6 B.R. 23 (Bankr.N.D.Ohio 1980). The Court notes that these decisions were rendered prior to the 1984 enactment of section 362(h). The Court also declines to follow case law that may be interpreted as imposing, in all instances, an affirmative duty upon creditors to search court records to ascertain whether a bankruptcy has been filed. *In re Constantino,* 80 B.R. 865 (Bankr.N.D.Ohio 1987).

164

Based upon the findings of fact and relevant case law and statutory provisions detailed above, the Court has concluded that the post-petition presentment of the check and subsequent phone call to the Debtor do not constitute willful violations of the automatic stay. While the Court has found that Mr. Schafer attempted to communicate with the Creditor orally and in writing, such pre-filing contact that references a future bankruptcy filing is not sufficient to constitute reasonable, actual notice, under the circumstances of this case. *In re Bragg*, at 48. The Court has reached this conclusion because both the Debtor and Mr. Schafer were aware that there was a pattern of issuing post-dated checks to obtain payroll advance loans, and that, depending upon the date of filing, some of the checks issued pre-petition could be presented on or shortly after the date of filing.

Rather than expecting creditors to adhere to notice of a future filing and to defer the exercise of their rights with reference to the checks, the Debtor should have made herself available to file as soon as possible and not waited until the day before the check at issue was due to be presented. Mr. Schafer, rather than relying upon the letter, should have ensured that immediately after filing, a copy of the petition was faxed or hand-delivered to all creditors holding post-dated checks. Both the Debtor's and Mr. Schafer's reliance on the pre-filing contact with the Creditor, in the context of the existence of the post-dated checks, was a recipe for the disaster that ensued and served as the basis for the March 30, 1999, phone call, the post-petition presentment of the check, its dishonor, and the subsequent reporting of the Debtor to the databases that govern the ability of consumers to open bank accounts and/or cash checks. The decision on this point, however, should not be taken as carte blanche to ignore all pre-petition warnings, but it is limited to the unique nature of the transactions in this case and the actions taken by the Debtor, Mr. Schafer and the Creditor.

The automatic stay is a significant benefit for debtors and a burden to creditors, and should be generally reserved for instances where there is a bankruptcy filing. It is presumptuous to create through pre-filing contact, except in the most extreme instances not present in this case, some sort of hybrid stay not contemplated by Congress that has had ample opportunity to create such a provision. Such contact is subject to abuse, denigrates the significance of the stay and serves as a trap for unwary creditors who have a right to generally expect that they are provided reasonable, actual notice of an actual bankruptcy filing before ceasing collection efforts.

The Court takes a different view of the issuance of the post-petition collection letter. The Court concludes that as of the March 30, 1999, phone conversations with the Debtor and Mr. Schafer, the Creditor had reasonable, actual notice of the bankruptcy filing, and was as of that time and date obligated to stop all collection efforts. Instead, it appears that at best, the Creditor dropped the ball apparently awaiting formal notification. It is not for creditors to decide when they will respect the rights of debtors and/or to interpret the applicability of the stay provisions. Instead, immediately upon receipt of reasonable, actual notice, they must stop collection, and if there is some doubt, file a motion for modification of the stay. Creditors will not be shielded from liability by turning a blind eye to reasonable, actual notice of a filing. For this stay violation, the Court awards the Debtor the sum of Eighty Dollars ($80.00) in actual damages for time off work during the hearing on the instant sanction motion, and gives the Debtor leave to file an application within twenty (20) days detailing legal fees and expenses. Because the Court has found and concluded that only the post-petition collection letter was violative of the stay, legal fees and expenses awarded will be

limited accordingly.[6] Upon review of the fee application and any objection by the Creditor, a judgment order will be entered. If the Debtor seeks punitive damages, a separate request detailing the basis shall be filed and served upon the Creditor within twenty (20) days from entry of this Memorandum Opinion and Order.

In conclusion, the Court is frankly dismayed with the time and energy expended by all in this litigation. It's as if the long-standing stay provisions are of recent origin. Reasonable and actual notice of the bankruptcy filing and professional, courteous post-petition communications, rather than the rancorous exchanges and phone hang-ups that took place in the instant case, would have gone a long way to eliminate this dispute.

**IT IS SO ORDERED.**

**6.** It is not clear whether Mr. Schafer contacted the Creditor after issuance of the collection letter and prior to the filing of the instant sanctions motion, in order to resolve the dispute without this litigation. *In re Price,* 179 B.R. 70 (Bankr.S.D.Ohio 1995); *In re Roush,* 88 B.R. 163 (Bankr.S.D.Ohio 1988); *In re Newell,* 117 B.R. 323 (Bankr.S.D.Ohio 1990). This issue will be considered in the context of what, if any, fees and expenses will be awarded.