PAUL KELLY, JR., Circuit Judge,
concurring in part and dissenting in part:
I join the majority of the court’s opinion, but I respectfully dissent from its conclusion that M & M willfully violated the automatic stay by failing to return the Chevy pickup after receiving a telephone call from the Johnsons’ attorney.
To prove a violation of the automatic stay, the Johnsons “bear[ ] the burden of establishing, by a preponderance of the evidence, that [M & M] knew of the automatic stay and intended the actions that constituted the violation.” Ct. Op. at 1172. M & M cannot have wilfully violated the stay unless it had actual notice of it. See id. at 1172. “Notice is regarded as actual where the person charged with notice either knows the particular facts in question or is conscious of having the means to know them, even though such means have not been used.... Actual notice embraces those things that reasonably diligent inquiry and exercise of the means of information at hand would disclose.” 58 Am. Jur.2d Notice § 4 (2002).
The dispute in this case arises from two nearly simultaneous events: the Johnsons filed for bankruptcy on May 6, 2004, and M & M repossessed the Chevy pickup on either May 10 or May 13. ApltApp. at 63. The bankruptcy court found — and the par *1177 ties do not dispute — ’that M & M had not received notice of the bankruptcy stay at the time that it repossessed the pickup. Id. The court further found that Mr. Smith, the Vice President of M & M, “took a May 13, 2004 telephone call from the Debtors’ counsel requesting a turnover of the Chevy.” Id. Crucially, the court credited Mr. Smith’s testimony that “[b]ecause of counsel’s demeanor, Mr. Smith was suspicious that the Debtors were simply attempting to get the Chevy back improperly.” Id. It likewise credited Mr. Smith’s assertion that he refused to return the pickup because of these suspicions. Id.
Specifically, Mr. Smith testified that he frequently dealt with customers’ bankruptcies as part of his job responsibilities. Id. at 174. Therefore, he was accustomed to speaking with bankruptcy attorneys, and he was familiar with the court-provided notice sent to creditors in conjunction with the filing of a bankruptcy petition. Id. at 170-71. However, Mr. Smith did not know the Johnsons’ counsel, and he testified that he harbored serious doubts about the truth of counsel’s assertions because “it wasn’t [like] any phone call I’ve ever taken in my professional career in regards to bankruptcy matters. Certainly from an attorney.” Id. at 172. He further testified: “[i]n a very abrupt and harsh manner [counsel] explained that we better get our act together and return the vehicle, at which time I started questioning him and he just got downright irate with me so that was the end of the phone call.” Id. at 242. Notably, Mr. Smith explained that counsel “did not offer to fax me a notice that they were in bankruptcy or anything ... and when I challenged him on that, he got extremely upset.” Id. at 171. The call ended when counsel hung up on Mr. Smith. Id. at 243.
Following the incident, Mr. Smith “sat there and shook [his] head and thought something wasn’t right.” Id. In his experience, “more often everyone is very honorable, but sometimes you come across those that know the system and know how to get around things and therefore you have to have your guard up to protect the interest of your company.” Id. at 172-73. Therefore, he explained, “[fit’s not as if you would assume that when someone represents that they’re an attorney that they’re liars because you try not to, but unfortunately, when a volatile situation like a repossession occurs, naturally you’re going to put up the safeguards and the safeguards indicated this isn’t normally how I speak to an attorney.” Id. at 242-43. Indeed, Mr. Smith recalled that he had such doubts about the validity of the call that he spoke to several colleagues to “sound it off to them because I was just in pure shock that I had a conversation [of] this nature with this gentleman.” Id. at 243.
Mr. Smith’s testimony at two hearings— one to determine whether M & M willfully violated the stay and the other to determine damages — is the only evidence in the record describing the telephone call he received from counsel. This testimony was consistent and uncontradicted, and it paints a clear picture of a well-intentioned businessman confronted with an unsubstantiated demand from an unknown caller that he relinquish property worth $13,000. The actual notice standard requires the person receiving notice to be left free of reasonable concerns about the validity of the communication purporting to give him notice.[1] Given the bankruptcy court’s un *1178 contested finding that “[bjecause of counsel’s demeanor, Mr. Smith was suspicious that the Debtors were simply attempting to get the Chevy back improperly,” id. at 68, it is clear that the Johnsons did not carry their burden of proving a willful violation by a preponderance of the evidence. In other words, the bankruptcy court’s finding that Mr. Smith acquired actual notice of the stay despite his honestly-held doubts about the validity of the call was clearly erroneous.
Even if the notice given here was sufficient to require Mr. Smith to make further inquiry, as the bankruptcy court concluded, see id. at 54, his attempt to do so by asking counsel to fax him the cover sheet of the Johnsons’ bankruptcy petition was rebuffed, id. at 171. Inquiry notice must at least contain enough information to permit the creditor to verify that a petition has been filed. Here, the unknown caller did not give Mr. Smith any information suggesting when or where the petition was filed. Mr. Smith certainly cannot be expected to call each of the 91 United States bankruptcy courts to ask whether they had any recent bankruptcy filings by debtors named “Johnson.”
The court dismisses this concern because “M & M is a sophisticated car dealership represented by counsel and admittedly quite familiar with repossession and bankruptcy.” Ct. Op. at 1173. Ironically, however, M & M’s sophistication and familiarity with bankruptcy is what caused it to become suspicious in the first place. M & M was accustomed to receiving bankruptcy notices, but it had not received one in this case. M & M was accustomed to dealing with bankruptcy attorneys, but Mr. Smith testified that the call here was unlike any other he had received in his professional career. Of course, M & M’s experience also taught it that dishonest debtors sometimes seek to fight repossession by ruse. If anything, therefore, M & M’s sophistication and bankruptcy experience made Mr. Smith’s doubts about the validity of the unknown caller’s assertions even more reasonable than they otherwise would have been.
Although the court recognizes the validity of these doubts, id. at 1167, it holds that Mr. Smith acquired actual notice of the Johnsons’ pending bankruptcy. This holding excuses debtors from their filing obligations while placing creditors with reasonable doubts about the validity of notice in an untenable position. If Congress intended creditors to trust an unknown caller representing that a bankruptcy petition had been filed, it would have spared courts the time and effort of serving creditors. Instead, the law recognizes that reasonable creditors will want concrete evidence of the pendency of a bankruptcy before relinquishing their rights against the debt- or; this is why notice of a bankruptcy is supposed to come directly from the court. See Fed. R. Bankr.P.2002(a). Even in a case like this, where service failed due to a mistake, counsel could easily have provided actual notice by faxing M & M a copy of the petition, see Fleet, 196 F.3d at 267; Flack, 239 B.R. at 164, bringing the petition to M & M and speaking with Mr. Smith in person, see In re Dunning, 269 B.R. 357, 368 (Bankr.N.D.Ohio 2001) (“[T]he bank received actual notice of [the bankruptcy] filing because [the debtor] took [his petition] to the Bank and showed it to the two named individuals who were employed by the bank.”), or simply providing a case number to M & M’s attorney, see In re Smith, 180 B.R. 311, 318 (Bankr.N.D.Ga.1995) (“[A] case number ... is essential in order to provide actual notice of a pending bankruptcy case.”). Counsel’s failure to take one of these simple steps, especially in light of Mr. Smith’s request for documentation, see Aplt.App. at 171, justified M & M’s suspicion that the call was not genuine.
*1179 Accordingly, I would hold that M & M’s violation of the stay between the time it received the telephone call on May 13, 2004, and the time that it returned possession of the truck to the Johnsons on May 28, 2004, was not willful. The bankruptcy court’s order may be read as finding a separate willful violation of the stay when M & M noted a lien on the title transfer documents. See Aplt.App. at 54-56. I have no quarrel with the bankruptcy court’s findings on this issue, and I join the court in affirming them.

. Although a telephone call can provide actual notice, see, e.g., Rowe v. Steinberg, 253 B.R. 524, 528 (E.D.Mich.2000); In re Flack, 239 B.R. 155, 164 (Bankr.S.D.Ohio 1999), especially when it is accompanied by documentary confirmation, see, e.g., Fleet Mortgage Group, Inc. v. Kaneb, 196 F.3d 265, 267 (1st Cir.1999); Flack, 239 B.R. at 164, actual notice must always be reasonable on the facts of the case, Flack, 239 B.R. at 164.