**In re TLB EQUIPMENT, LLC, Debtor.**

**TLB Equipment, LLC, Plaintiff**

v.

**Quality Car & Truck Leasing, Inc., Defendant.**

**Bankruptcy No. 08–53990.
Adversary No. 08–2243.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division at Columbus.

Sept. 28, 2012.

Gary Paul Price, Price Law Firm, LLC, Columbus, OH, for Plaintiff.

Gregory A. Stout, Reisenfeld and Associates, Cincinnati, OH, Thomas L. Canary, Lexington, KY, for Defendant.

## MEMORANDUM OPINION

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

### I. Introduction

Quality Car and Truck Leasing, Inc. ("Quality") lawfully repossessed ten coal trucks and ten trailers ("Equipment") from TLB Equipment, LLC ("TLB"), and two weeks later TLB commenced a Chapter 11 bankruptcy case. Unaware of the commencement of the case, Quality sold the Equipment to Carl Kirk Trucking, Inc. ("Kirk Trucking"). Nearly two months later, TLB filed a motion for turnover of the Equipment. Quality objected to the motion, arguing that TLB's request for turnover should have been made by adversary proceeding and that Quality lacked notice of the bankruptcy at the time of the sale. Quality was, of course, correct that an adversary proceeding was required. *See* Fed. R. Bankr.P. 7001.[1] As it turns out, it was also right about the lack of notice.

■ In fact, Quality lacked not only notice, but also knowledge of the commencement of TLB's case at the time of the sale. Accordingly, there was no basis for a turnover action against Quality. *See* 11 U.S.C. § 542(c).[2] Nonetheless, TLB brought a

1. With limited exceptions not applicable here, "a proceeding to recover money or property" is an adversary proceeding. Fed. R. Bankr.P. 7001(1).

2. In pertinent part, this section states:
 [A]n entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate ... to an entity other than the trustee, *with the same effect as to the entity making such transfer or payment as if the case under this title concerning the debtor had not been commenced.* 11 U.S.C. § 542(c) (emphasis added). As the Supreme Court has stated, "[s]ection 542 provides that ... turnover is not required ...

when the holder of the property has transferred it in good faith without knowledge of the petition, § 542(c)...." *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 206 n. 12, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). *See also Buckeye Check Cashing, Inc. v. Meadows (In re Meadows),* 396 B.R. 485, 493 (6th Cir. BAP 2008) ("Under § 542(a), an entity in possession, custody, or control of property of the estate must deliver such property or its value to the bankruptcy trustee, unless of inconsequential value. An exception to this turnover requirement is provided in subsection (c) of § 542, which provides that an entity without knowledge of a debtor's bankruptcy may in good faith transfer property of

turnover action against Quality, and the parties entered into an agreed order ("First Agreed Order") (Doc. 35),[3] which stated that "it is anticipated that [TLB] may commence an adversary proceeding," First Agreed Order ¶ 4, presumably for the purpose of recovering the alleged damages, attorneys' fees and other claims that TLB would not be "prejudiced or otherwise precluded from seeking. . . ." *Id.* ¶ 3. The First Agreed Order also provided that Quality would return the Equipment to TLB within seven days of its entry, *see id.* ¶ 1, and that TLB would "provide proof of insurance to [Quality] prior to operation of [the Equipment] from place of pickup by [TLB] or delivery by [Quality]." *Id.* ¶ 8. TLB then commenced this adversary proceeding against Quality. In its complaint, TLB not only sought damages, but also requested that the Court set aside the sale to Kirk Trucking and order Quality to return the Equipment.

TLB did not provide Quality with proof of insurance. Yet, notwithstanding its failure to do so, TLB filed a motion requesting that the Court hold Quality in contempt for its non-return of the Equipment. The parties then entered into a supplemental agreed order ("Second Agreed Order") (Doc. 55) under which Quality was to relocate the Equipment to its place of business for inspection by TLB and TLB was to have until a date certain "to provide evidence of insurance, in the form of a binder or issued policy," Second Agreed Order ¶ 4, or else the automatic stay would be terminated with respect to the Equipment. *Id.* ¶ 5.

TLB again failed to provide Quality with evidence of insurance, and as a result the Court entered an order terminating the automatic stay with respect to the Equipment, with the parties preserving their rights in the adversary proceeding. TLB subsequently filed an amended complaint ("Amended Complaint") (Adv. Doc. 15) in which it no longer requested that the Court set aside the sale or order the return of the Equipment, but rather sought actual and punitive damages for Quality's alleged violations of the automatic stay and the First Agreed Order.

The Court held a trial over two days, during which it heard the testimony of multiple witnesses for both parties and received numerous documents into evidence.[4] Following the trial, the parties submitted proposed findings of fact and conclusions of law. In its proposed findings and conclusions ("TLB Findings and Conclusions") (Adv. Doc. 71), TLB requests—in addition to the relief requested in its amended complaint—that the Court find that Quality violated the automatic stay when it allegedly applied certain funds it received postpetition to satisfy a prepetition claim of Quality against TLB. In total, TLB seeks $788,640, plus attorneys' fees and costs. The measure of damages is the equity in the Equipment that TLB argues it would have accumulated had the Equipment been returned and the debt to Quality fully satisfied.

As explained in more detail below, the Court concludes that TLB is not entitled to any recovery. First, Quality had neither notice nor knowledge of the commencement of TLB's case at the time of

---

the estate or pay a debt owing to the debtor.").

**3.** References to documents filed in TLB's bankruptcy case will be designated as "Doc.——" and references to documents filed

in this adversary proceeding will be designated as "Adv. Doc. ——."

**4.** Pages 1 through 268 of the trial transcript ("Tr.") are located at Adv. Doc. 63, and pages 269 through 563 are located at Adv. Doc. 65.

the sale of the Equipment to Kirk Trucking, meaning that Quality cannot be held liable for a violation of the automatic stay on account of the sale. Second, because TLB never satisfied the precondition for the return of the Equipment set forth in the First Agreed Order—the provision of evidence of insurance—Quality did not violate the First Agreed Order by not returning the Equipment. Third, the debt for which Quality received payment post-petition was not TLB's, but instead was the debt of Tommy Belville Trucking, Inc. ("Belville Trucking"), an affiliated entity that has not commenced a bankruptcy case. Finally, TLB failed to show that the payments owed to Quality would have been made even if TLB had regained possession of the Equipment and thus failed to demonstrate that it would have developed any equity in the Equipment.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2)(E).

## III. Findings of Fact

Based on the stipulations of the parties and the evidence adduced at trial, including the documentary evidence and the testimony presented, and having considered the demeanor and credibility of the witnesses, the Court makes the findings of fact set forth below.

### A. Events Leading to Quality's Repossession and Sale of the Equipment

The story of TLB begins with Thomas Lee Belville ("Mr. Belville"), an individual whose initials form part of the company's name.[5] For many years, Mr. Belville operated a small coal hauling business as a sole proprietor. See Tr. at 17:2–12; 238:5–6; 492:7–14. Seeking to expand his business beyond the few trucks he owned, Mr. Belville formed and became the sole shareholder of Belville Trucking in 2005.[6] See Tr. at 110:7–111:2; 238:9–10. That same year, Belville Trucking began to obtain additional trailers, financing the purchase through Quality. See Tr. at 18:2–7; 333:10–19. Quality is in the business of financing the purchase of commercial equipment and—using the fictitious name "Quality Finance"—financing commercial insurance premiums. See Joint Stipulations of Fact ("General Joint Stipulations") (Adv. Doc. 55) ¶¶ 4–5.[7]

By early 2007, Belville Trucking was four months in arrears on payments owing

5. According to the records of the Ohio Secretary of State, TLB's correct legal name is T.L.B. Equipment L.L.C., see Quality Ex. B, but TLB has consistently referred to itself in this adversary proceeding as TLB Equipment, LLC.

6. Belville Trucking has not commenced a bankruptcy case. During the trial, counsel for TLB pointed out that TLB's petition was filed with the notation "DBA Tommy Bellville [sic] Trucking, Inc." and argued that Belville Trucking therefore was a bankruptcy debtor even though TLB and Belville Trucking are separate corporate entities. As the Court explained during the trial, counsel's argument in this regard is wholly without merit. See Tr. at 103–106. First, the evidence showed

that Tommy Belville Trucking, Inc. is an entirely separate corporate entity, not a fictitious name under which TLB operates. See Tr. at 241:24–242:13; 276:3–277:10. Second, a voluntary case is commenced by the filing of a petition, see 11 U.S.C. § 301, and Belville Trucking did not file a petition—only TLB did, with Mr. Belville signing the petition on its behalf as President. If Mr. Belville and his counsel, Gary Paul Price ("Mr. Price"), intended to file a bankruptcy case for Belville Trucking, then they should have caused Belville Trucking to file a petition.

7. Different employees are responsible for the equipment financing and premium financing components of Quality's business. See Tr. at 332.

to Quality under the 2005 financing agreements, and also owed debts to at least one other lender. *See* Tr. at 334:18–20; 336:7–9; 342:13–15. In April 2007, Quality agreed to refinance its loans with Belville Trucking and the other lender(s) by providing new loans ("Loans") secured by the Equipment. *See* General Joint Stipulations ¶ 7–8; Tr. at 338:18–339:5.[8] Mr. Belville formed and became the sole member of a separate corporate entity, TLB, and Belville Trucking transferred title to the Equipment to TLB. *See* Tr. at 238:5–25; 334:22–335:2. Thus, Belville Trucking became the entity that used the Equipment to generate income through coal hauling contracts, *see* Tr. at 110:7–111:2, while TLB was the entity that owned the Equipment.[9] *See* Tr. at 238:1–239:16. Around the time of the refinancing, Ms. Angell contacted Brenda Thompson ("Ms. Thompson"), Quality's Vice President, to inquire whether it would be acceptable to Quality if Belville Trucking were to transfer the Equipment to TLB, and Ms. Thompson responded that it would be so long as the security agreement was also signed on behalf of TLB. *See* Tr. at 334:18–335:2. Thus, both TLB and Belville Trucking, as well as Mr. Belville, were borrowers under the Loans. *See* Quality Ex. E–V; X–Y.

Beginning with the first month after the refinancing, the account again became delinquent. *See* Tr. at 342:15–19. Ms. Thompson sent default notices and default letters, but did not receive any response.

*See* Tr. at 342:16–343:17. In addition, Quality's attorney sent a default letter, but the account still was not brought current. *See* Tr. at 343:20–25. Early in 2008, Quality sent a collection agent to TLB's place of business to repossess the Equipment. *See* Tr. at 343:24–344:6. Quality, however, had not obtained an order for repossession, and Mr. Belville did not consent to the repossession, meaning that Quality could not have repossessed the Equipment without breaching the peace, so the Equipment remained in TLB's possession. *See* Tr. at 344:6–12. During a subsequent meeting between Mr. Belville and representatives of Quality in March 2008, Mr. Belville agreed to have Rick Howell, for whom Belville Trucking was providing hauling services, pay $13,000 per week to Quality to bring the account current. *See* Tr. at 345:3–23. Quality, however, never received the promised weekly payments. *See* Tr. at 346:9–11.

Due to the continued default on the Loans, Quality commenced a replevin action against TLB in order to obtain possession of the Equipment. The replevin action was filed in the Kanawha County Circuit Court in West Virginia ("Kanawha County Court"), *see* Tr. at 346:15–25,[10] and, on April 4, 2008, Quality obtained an order of replevin from the Kanawha County Court granting Quality possession of the Equipment. *See* General Joint Stipulations ¶ 25; Quality Ex. BB. On April 15, 2008, with a copy of the order in hand and

---

**8.** As discussed below, Quality also provided financing of insurance premiums due on the Equipment. *See* General Joint Stipulations ¶ 12.

**9.** Mr. Belville's accountant, Lynn Angell ("Ms. Angell"), testified that Belville Trucking was to pay rent to TLB for use of the Equipment, *see* Tr. at 238:25–239:16, but that the rent payments were not made. *See* Tr. at 239:17–240:15; 279:22–23. In fact, TLB received no income; had no employees; paid no taxes;

and did not report any depreciation relating to the Equipment. *See* Tr. at 276:23–284:19. In contrast, Belville Trucking employed individuals; operated the Equipment; received income; and reported depreciation relating to the Equipment on its tax returns. *See* Tr. at 276:23–284:19.

**10.** At the time, the Equipment was located in Kanawha County, West Virginia because Mr. Belville was working there through Belville Trucking. *See* Tr. at 347:10–13.

with the assistance of a deputy sheriff, Quality, acting through Ms. Thompson and ten drivers, repossessed the Equipment in Kanawha County, West Virginia and returned the Equipment to Quality's lot in Portsmouth, Ohio. *See* Tr. at 347:22–349:24.[11] On April 15, 2008, Quality issued notices of its intent to conduct a sale of the Equipment on April 30, 2008, if the Equipment was not redeemed before then. *See* General Joint Stipulations ¶ 27; Tr. at 351:5–352:1; Quality Ex. Z. Quality did not receive a response to those notices from Mr. Belville on TLB's behalf. *See* Tr. at 352:2–5. Quality also issued notices of public sale that were published in the *Portsmouth Daily Times*. *See* Tr. at 352:10–353:2; Quality Ex. CC. Mr. Belville did not respond to those notices, *see* Tr. at 353:6–8, nor was there any other communication between Mr. Belville and Ms. Thompson between the repossession date and April 30, 2008, the date of the announced public sale. Tr. at 353:9–13. In addition to providing notice of the public sale, Quality solicited bids from several equipment dealerships and trucking companies. *See* Tr. at 356:10–18; 358:4–22.

Kirk Trucking and Danco Trucking ("Danco") submitted bids. *See* Tr. at 359:2–7. Kirk Trucking's and Danco's initial bids were $1,100,000 and $1,275,000, respectively. *See* Tr. at 360:2–9. Ms. Thompson declined both bids because she believed the Equipment's value was higher than the bids. *See* Tr. at 360:14–23. Kirk Trucking responded with a new bid of $1,350,000. *See* Tr. at 361:2–4.

On April 25, 2008, Quality obtained repossession certificates of title to the Equipment from the Ohio state motor vehicle registration authorities. *See* General Joint Stipulations ¶ 28. On April 30, 2008, Ms. Thompson, on behalf of Quality, accepted Kirk Trucking's second bid. *See* Tr. at 361:2–4; Quality Ex. JJ. Two days later, on May 2, 2008, the transaction was memorialized through purchase orders signed by Ms. Thompson on behalf of Quality and Carl Kirk on behalf of Kirk Trucking. *See* Tr. at 363:1–10; 364:13–365:14; Quality Ex. PP. On May 6, 2008, Ohio certificates of title with respect to the Equipment were issued to Kirk Trucking.

---

11. Mr. Belville testified that first at the time of repossession of the Equipment and second by telephone on April 28, 2008—in both instances prior to the April 29, 2008 date of TLB's bankruptcy filing ("Petition Date")—he advised Ms. Thompson that he was going to file a bankruptcy case, although he did not testify regarding on whose behalf (i.e., his, Belville Trucking's and/or TLB's) he intended to file the case. *See* Tr. at 26:9–20. By contrast, Ms. Thompson testified that Mr. Belville made no such representation on the date of repossession and that she had no communication with him after the repossession through the Petition Date. *See* Tr. at 347:20–348:10, 16–21; 353:9–13. As discussed below, it does not matter whose recollection is accurate on this point. Even if Mr. Belville had advised Ms. Thompson that he intended to file a bankruptcy case on behalf of TLB, this would not have provided Quality with notice or knowledge of the case that TLB ultimately commenced. *See In re Flack*, 239 B.R. 155, 164 (Bankr.S.D.Ohio 1999) ("The automatic stay is a significant benefit for debtors and a burden to creditors, and should be generally reserved for instances in which there is a bankruptcy filing. It is presumptuous to create through pre-filing contact, except in the most extreme instances not present in this case, some sort of hybrid stay not contemplated by Congress that has had ample opportunity to create such a provision. Such contact is subject to abuse, denigrates the significance of the stay and serves as a trap for unwary creditors who have a right to generally expect that they are provided reasonable, actual notice of an actual bankruptcy filing before ceasing collection efforts."); *Tese–Milner v. Moon (In re Moon)*, 385 B.R. 541, 557 (Bankr.S.D.N.Y.2008) (holding that creditor did not have actual knowledge of the bankruptcy filing where the debtor informed creditor of the possibility that a bankruptcy case would be filed).

*See* Tr. II at 365:15–366:7.[12]

## B. Quality's Lack of Notice and Knowledge of the Case at the Time of the Sale

■ Quality's practice is to search the Public Access to Court Electronic Records database ("PACER") prior to a sale of repossessed equipment in order to determine whether its borrower has commenced a bankruptcy case. *See* Tr. at 353:23–354:3. On April 25, 2008, an employee of Quality other than Ms. Thompson searched PACER for information regarding a bankruptcy filing that would have stayed the sale to Kirk Trucking. *See* Tr. at 354:21–355:3. That search and others that Quality later conducted, *see* Tr. at 355:4–11, did not reveal TLB's bankruptcy filing, because the employee searched only under the names of Mr. Belville and Belville Trucking. *See* Tr. at 383:3–384:24. Ms. Thompson explained that the employee who conducted the PACER search did so using the names associated with the account in Quality's computer system, and TLB's name was not in the computer system given that it was added to the account only in connection with the refinancing. According to Ms. Thompson: "[I]n our computer system there's only room for so many names and so I prepared the loan document and then I had to go back and type TLB Equipment on there. So when you go into our computer TLB does not come up, it's Tommy Belville Trucking and Tommy Belville." Tr. at 384:1–6. As al-

ready discussed, TLB's petition was filed with the notation "DBA Tommy Bellville [sic] Trucking, Inc." This was insufficient to commence a bankruptcy case for Belville Trucking, but if the name of the company had not been misspelled on the petition as "Tommy Bellville Trucking, Inc.," then Quality's search of Tommy Belville Trucking, Inc. may have revealed TLB's bankruptcy. But because the name was misspelled, Quality's search did not reveal TLB's case. Based on the foregoing, the Court finds that Quality did not have notice or knowledge of the commencement of TLB's case at the time of the sale to Kirk Trucking based on Quality's own efforts to determine whether a bankruptcy filing would have stayed the sale.[13]

No evidence was introduced at the trial intimating that Mr. Belville himself attempted to provide notice of TLB's bankruptcy filing to Ms. Thompson or anyone else at Quality after the Petition Date. Furthermore, Quality did not have notice or knowledge of the commencement of TLB's case at the time of the sale based on any effort made by TLB's attorneys. No evidence was presented establishing that TLB's bankruptcy counsel, Mr. Price, provided notice to Quality of TLB's bankruptcy before the sale to Kirk Trucking.

TLB also retained an attorney licensed in both Ohio and West Virginia, Amy Levine ("Ms. Levine"), to perform legal services in West Virginia. *See* Tr. at 173:12–19. Ms. Levine testified that she tele-

---

12. West Virginia certificates of title were issued to Kirk Trucking on May 8, 2008. *See* Tr. at 25:8–12; TLB Ex. 11.

13. Although Quality would have had actual knowledge of TLB's bankruptcy case if its searches had been successful, Quality did not have a duty to conduct such a search given that it had not at the time of its searches been advised by anyone on behalf of TLB that TLB had actually commenced a bankruptcy case.

*See Litton Loan Servicing, LP v. Rockdale Cnty. (In re Howard)*, 391 B.R. 511, 516 (Bankr.N.D.Ga.2008) ("To the extent that Litton contends that either Rockdale County or ALF were under a general duty to search the records in the bankruptcy court to determine whether any property subject to tax sale was property of a bankruptcy estate, an argument for which it has offered no legal support, the Court rejects such contention.").

phoned the office of Quality's West Virginia replevin counsel, Thomas H. Vanderford ("Mr. Vanderford"), on the Petition Date. *See* Tr. at 174:12–13. According to Ms. Levine, she was unable to reach Mr. Vanderford because he was out of the office. *See* Tr. at 175:3–5; TLB Ex. 12 at 2. Ms. Levine had no contemporaneous records of the message she left. *See* Tr. at 178:19–23. Based on Ms. Levine's recollection of a conversation that occurred approximately three years prior to her testimony at trial, she believed that "we informed whoever answered the phone, his secretary, his paralegal, whoever, that we were trying to get hold of Mr. Vanderford to inform him that TLB Equipment *had in fact filed bankruptcy* and that we would be sending [a fax regarding the bankruptcy filing] over to their office." Tr. at 174:19–25 (emphasis added). Ms. Levine's own telephone log, however, states that she had a telephone call with Mr. Price at 11:28 a.m. on the Petition Date, and the log includes the following note: "Spoke with [G]ary to inform him that I could not reach WV attorney due to that attorney being out of office all week. Gary going to type client CYA letter and file if client will come sign today." TLB Ex. 12 at 1. In fact, TLB filed its bankruptcy petition later that day at 3:54 p.m.[14] In other words, Ms. Levine's own records show that she placed the call to Mr. Vanderford's office *before* TLB filed its bankruptcy case. This is consistent with Mr. Vanderford's testimony that Ms. Levine's call to his office was placed the day before the Petition Date, on April 28, 2008 at 4:51 p.m. *See* Tr. at 222:11–25.

■ Mr. Vanderford also testified that he was out of the office on vacation when the call came in, Tr. at 222:17–19; that his secretary/receptionist sent him an email regarding the call, Tr. at 223:24–25; that he received the email when he returned to the office on May 5, 2008, Tr. at 223:25–224:3; and that the email informed him that Ms. Levine had stated that she had been retained by Mr. Belville and TLB regarding the lawsuit in the Kanawha County Court, Tr. at 224:7–17, but that the email said nothing about a bankruptcy case. *See* Tr. at 231:5–24. On May 5, Mr. Vanderford returned Ms. Levine's call but did not reach her. *See* Tr. at 177:17–21; 224:25–225:2; TLB Ex. 12 at 2. He left her a message—which according to Ms. Levine's records stated that he was out of town the week before and was returning her call regarding the Belville matter. *See* TLB Ex. 12 at 2. Ms. Levine and Mr. Vanderford never actually spoke to one another. *See* Tr. at 177:22–25; 225:3–5. Given that Ms. Levine's testimony was based solely on her recollection of a telephone call she made approximately three years earlier and that Mr. Vanderford's testimony was based on an email sent contemporaneously with the event, the Court finds that the message from Ms. Levine did not mention TLB's bankruptcy. In addition, the Court finds that Ms. Levine made the call before TLB actually commenced its bankruptcy case.[15]

■ Ms. Levine also testified that she sent a notice of TLB's bankruptcy filing and the automatic stay ("Stay Notice") to the Kanawha County Court and mailed and faxed the Stay Notice to Mr. Vanderford on the Petition Date. *See* Tr. at 174:5–

---

14. The Court takes judicial notice of this information, which is available on its docket.

15. Ms. Levine's attempt to provide notice of TLB's bankruptcy prior to the Petition Date—like Mr. Belville's alleged statement to Ms.

Thompson at the time of the repossession—was insufficient to provide Quality with notice or knowledge of the bankruptcy case. *See Flack*, 239 B.R. at 163.

14. Ms. Levine's certificate of service filed with the Kanawha County Court stated that a copy of the Stay Notice "was served upon Thomas H. Vanderford . . . P.O. Box 2786, Charleston, WV 25330, via Facsimile and Ordinary, U.S. Mail, postage pre-paid, this 29th day of April 2008." TLB Ex. 13. Mr. Vanderford testified that he never received the Stay Notice by mail, *see* Tr. at 227:17–228:4, and that he did not receive the Stay Notice from Ms. Levine's office by fax until May 8, 2008. *See* Tr. at 225:22–226:15. *See also* General Joint Stipulations ¶ 33. Mr. Vanderford's testimony regarding the non-receipt by mail was supported by his description of the procedure for handling mail while he was out of the office. *See* Tr. at 227:21–228:4. Likewise, Mr. Vanderford's testimony regarding non-receipt of the fax that Ms. Levine's office allegedly sent on April 29, 2008 was bolstered by his description of the procedure at his office under which faxes are received over the office email system and his testimony regarding his investigation into whether the April 29 fax was caught in the firm's spam filter or received at a fax number other than his own; the investigation determined that the fax had not been received. *See* Tr. at 226:16–227:15; 229:19–230:6. Furthermore, Mr. Vanderford's fax number was not included in Ms. Levine's certificate of service, *see* TLB Ex. 13; someone other than Ms. Levine purportedly sent the fax, *see* Tr. at 177:4–8, and Ms. Levine's office maintained no records confirming whether faxes it sent were actually received. *See* Tr. at 176:8–13. Based on the foregoing, the Court finds that Mr. Vanderford did not receive the Stay Notice by fax until May 8, 2008 and never received the Stay Notice by mail.[16]

On May 5, 2008, the Stay Notice was file-stamped by the Kanawha County Court. *See* General Joint Stipulations ¶ 31; Quality Ex. RR. There is no evidence, however, that Quality or its attorneys or other representatives received the Stay Notice on that date.

On May 7, 2008, Quality received a copy of the Bankruptcy Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines ("Section 341 Notice"). *See* General Joint Stipulations ¶ 32. Ms. Thompson testified that this was the first time she received notification of TLB's bankruptcy. *See* Tr. at 368:13–369:12. As noted above, Ohio certificates of title with respect to the Equipment had already been issued to Kirk Trucking the day before, on May 6, 2008.[17]

---

16. "[E]vidence of transmission of a document by fax . . . does not create a presumption of receipt." *Gunter v. Kevin O'Brien Assocs. (In re Gunter)*, 389 B.R. 67, 73 (Bankr.S.D.Ohio 2008). Evidence that might give rise to a presumption of receipt includes a fax confirmation sheet or a telephone call confirming receipt. *See id.* There is no evidence of either here. Although a presumption of receipt by mail arises where the notice is properly addressed, has sufficient postage, and is deposited in the mail, *Gunter*, 389 B.R. at 73 n. 6, reliable testimony denying that a mailed notice was received is sufficient to rebut the presumption of receipt. *See Bratton v. Yoder Co. (In re Yoder Co.)*, 758 F.2d 1114, 1118 (6th Cir.1985).

17. Quality takes the position that "[o]n May 2, 2008, Carl Kirk Trucking, Inc. executed contracts and finalized its purchase of the Equipment from Quality." Doc. 70 ¶ 31. TLB appears to concede that the sale took place on May 2, 2008. *See* TLB Findings and Conclusions at 15 ("[D]isposition of the Equipment to a third-party purchaser did not occur until the Retail Buyers Orders were executed by Quality and Carl Kirk on May 2, 2008 and title to the Equipment was thereafter transferred into the name of Carl Kirk all of which occurred after the Petition Date."). The Court need not decide whether under Ohio law the sale occurred prior to May 6, 2008 because Quality had no notice or knowledge of TLB's bankruptcy case until after that date.

Based on the foregoing, the Court finds that Quality had neither notice nor knowledge of the commencement of TLB's bankruptcy case at the time of the sale to Kirk Trucking.

## C. The First Agreed Order

Approximately two months after the Petition Date, TLB filed a motion for turnover of the Equipment (Doc. 25) and a motion for expedited hearing on the turnover motion (Doc. 26), taking the position that its continued inability to use the Equipment would cause irreparable harm to its ability to reorganize. Finding that TLB's considerable delay in seeking turnover undercut its irreparable-harm argument, the Court denied the motion to expedite and set a hearing on the turnover motion for a date after the regular deadline to respond to the turnover motion had expired. See Doc. 27. Quality then filed a response (Doc. 30) to the motion that included an objection on the basis of lack of notice of the bankruptcy. As the Court already found, Quality indeed lacked notice and knowledge of TLB's bankruptcy at the time of the sale to Kirk Trucking. The notice issue was not decided in connection with the turnover motion, however, because the hearing on the motion was cancelled as a result of the First Agreed Order.

Entered on August 8, 2008, the First Agreed Order provided, among other things, that Quality "shall return [the Equipment] within 7 days of the entry of this order" (i.e., by August 15, 2008), First Agreed Order ¶ 1, and that TLB "shall

provide proof of insurance to [Quality] prior to operation of [the Equipment] from place of pickup by [TLB] or delivery by [Quality]." Id. ¶ 8. Although the First Agreed Order—which was jointly prepared by TLB and Quality—could have been clearer,[18] the Court finds that the most reasonable interpretation of the order is that, as a prerequisite to Quality's obligation to turn over the Equipment, TLB would provide evidence of insurance—such as an insurance binder—by August 15, 2008.[19]

The Court finds that TLB failed to do so. Mr. Belville attempted to obtain insurance coverage through Brown Insurance Agency ("Brown"), but that company—in a letter that Quality received in August 2008—declined to bind any coverage on the Equipment at that time, based on (among other things), Brown's belief that the Equipment was being used to haul coal, which is in fact how Belville Trucking had used the Equipment. See Tr. at 155:22–157:3; 373:14–374:7; Quality Ex. BBBB. In fact, TLB never provided Quality with an insurance binder or a policy of insurance for the Equipment after the Petition Date, and as a result the automatic stay as it related to the Equipment was eventually lifted.

Prior to March 29, 2008, the Equipment was covered by physical damage insurance. That insurance lapsed, and TLB contends that Quality was responsible for its non-renewal. The basis for Quality's defense to TLB's claim for violation of the First Agreed Order is that Quality had no obligation to turn over the Equipment un-

---

**18.** Perhaps it was due to the lack of clarity in the First Agreed Order that Quality, apparently out of an abundance of caution, filed a motion to stay enforcement of the First Agreed Order after TLB failed to provide evidence of insurance. See Doc. 38.

**19.** Although there is a split of authority regarding the issue of whether a secured creditor may decline to turn over uninsured collateral, the Court need not reach that issue in light of the terms of the First Agreed Order, which called for the provision of evidence of insurance as a prerequisite to turnover.

til TLB provided evidence of insurance. For the reasons explained above, the Court finds that this is a valid defense. But the efficacy of the defense would be diminished (or eliminated) by a factual showing that Quality wrongfully caused the insurance to lapse or wrongfully failed to reinstate the insurance. Thus, the circumstances that led to the lapse and non-renewal are relevant and will be recounted below.

Rosemount City Insurance Agency, Inc. ("Rosemount") is a general independent insurance agency that, through insurance agent Ralph Cartee ("Mr. Cartee"), began assisting Mr. Belville in obtaining insurance for his trucks while he was still operating as a sole proprietor. *See* Tr. at 18:2–9; 463:18–20; 489:4–492:16. Although Rosemount is owned by members of the same family that owns Quality (the Glockner family of Portsmouth, Ohio), *see* General Joint Stipulations ¶ 6, Rosemount, which is not a defendant in this adversary proceeding, is a separate corporate entity. *See* Tr. at 489:14–490:2.

In 2007, Rosemount assisted Mr. Belville and his companies in obtaining a policy of physical damage insurance ("Physical Damage Insurance") on the Equipment. *See* Tr. at 129:19–131:21. Mr. Belville and his companies were unable to pay the full amount of the premium required to obtain the Physical Damage Insurance, *see* Tr. I at 130:18–21, so Quality financed the premium. *See* General Joint Stipulations ¶ 12. In order to finance an insurance premium, a Quality customer must provide a down payment and sign a premium finance agreement. *See* Tr. at 475:24–476:6. In connection with the financing of the Physical Damage Insurance, Belville Trucking and Quality entered into a premium finance agreement ("Physical Damage Premium Finance Agreement") in September 2007. *See* General Joint Stipulations

¶ 15; Tr. at 474:9–12; Quality Ex. AAA. Pursuant to the Physical Damage Premium Finance Agreement, Quality paid the full premium for the entire period of coverage, *see* Tr. at 462:1–7, in exchange for a down payment and four regular monthly payments by Belville Trucking. *See* Tr. at 462:5–6; 466:1–6; 475:8–19. Those four payments were made, although each one was late, with the last payment being 30 days past due. *See* Tr. at 476:10–16.

Even though the payments under the Physical Damage Premium Finance Agreement were made over a four-month period, the Physical Damage Insurance had a six-month term and was set to expire on March 29, 2008. *See* General Joint Stipulations ¶ 16; Joint Stipulations of Fact Re: Payment Received by Rosemount City Insurance, Inc. ("Insurance Joint Stipulations") (Adv. Doc. 58) ¶ 1.1; Tr. at 476:17–20. In order to finance the premium that would be due upon renewal of the Physical Damage Insurance, Belville Trucking was required to provide another down payment and enter into another premium finance agreement. *See* Tr. at 476:21–477:22. On March 25, 2008, Rosemount sent a request for renewal of the Physical Damage Insurance and a new premium finance agreement to TLB. *See* General Joint Stipulations ¶ 20; Tr. at 501:19–505:15. Mr. Cartee and Mr. Belville also had a conversation regarding the need for a down payment and another signed premium finance agreement. *See* Tr. at 502:9–21. Mr. Belville, however, did not execute a new premium finance agreement or pay the required down payment on behalf of TLB. *See* Insurance Joint Stipulations ¶ 1.1; Tr. at 501:19–505:15. The Physical Damage Insurance expired on March 29, 2008, and the insurance carrier sent a notice of non-renewal. *See* Tr. at 366:11–367:7; 505:16–506:17.

At Mr. Belville's request, a company for which Belville Trucking was performing

coal hauling services, Medford Trucking, sent $11,231 ("Medford Payment") to Rosemount; the Medford Payment was deposited into Rosemount's account on April 15, 2008. *See* Insurance Joint Stipulations ¶ 1.3. During the trial, Mr. Belville contended that the Medford Payment was intended to cover and should have covered the down payment necessary to renew the Physical Damage Insurance. *See* Tr. at 548:16–552:3. After the trial, however, TLB stipulated that the required down payment was not made, *see* Insurance Joint Stipulations ¶ 1.1, and the evidence presented at the trial was not contrary to that stipulation. Furthermore, even if a down payment had been made, Quality would not have financed TLB's premium for physical damage insurance in light of the failure to execute a new premium finance agreement, *see* Tr. at 480:1–13; 511:16–512:2, and no evidence was offered establishing that Quality had any contractual obligation to finance TLB's premiums. Based on the foregoing, the Court finds that Mr. Belville and TLB failed to take the steps necessary to renew the Physical Damage Insurance and, conversely, that Quality neither caused the Physical Damage Insurance to lapse nor wrongfully failed to cause it to be reinstated.

## D. The Postpetition Application of Funds

■ In addition to the Physical Damage Insurance, a commercial liability policy ("Liability Insurance") was in place, and, like the premiums for the Physical Damage Insurance, the premiums for the Liability Insurance were financed through Quality under a premium finance agreement ("Liability Premium Finance Agreement"). The documentary evidence clearly showed that the parties to the Liability Premium Finance Agreement were Quality and Belville Trucking; TLB was not a party. *See* Quality Ex. KKK.[20] Payments under the Liability Premium Finance Agreement were typically late, and the Liability Insurance was cancelled and reinstated more than once. *See* Tr. at 469:2–5. Due to the non-payment of amounts owing under the Liability Premium Financing Agreement and the resulting nonpayment of premiums under the policy, the Liability Insurance was eventually cancelled for the last time, by a notice mailed by the insurance carrier. *See* Quality Ex. NNN; Insurance Joint Stipulations ¶ 1.6. On May 21, 2008 Rosemount received a refund in the amount of $15,557 for the unearned premium under the Liability Insurance. *See* Insurance Joint Stipulations ¶ 1.6. Of this amount, Rosemount paid $11,077.26 to Quality to satisfy amounts owing under the Liability Premium Finance Agreement. *See* Insurance Joint Stipulations ¶ 1.6.

## E. Equity in the Equipment

Based on the foregoing, the Court finds that TLB and its affiliated entities were

---

**20.** Prior to the trial, the parties stipulated that "TLB signed a premium Finance Agreement and agreed to pay eight installments, beginning on October 29, 2007, to Quality for the premium on a commercial liability policy that covered the Equipment." General Joint Stipulations ¶ 13. Although factual stipulations are generally binding and conclusive, *see Christian Legal Soc. v. Martinez*, —— U.S. ——, ——, 130 S.Ct. 2971, 2983, 177 L.Ed.2d 838 (2010), this is not true if, among other things, "the evidence contrary to the stipulation is substantial." *Thompson v. Roland (In re Roland)*, 294 B.R. 244, 250 (Bankr. S.D.N.Y.2003). Here, the evidence contrary to the stipulation (a copy of the Liability Premium Finance Agreement) is substantial. In fact, in its own findings of fact, TLB acknowledged that the Belville entity that was a party to the Liability Premium Finance Agreement was Belville Trucking. *See* TLB Findings and Conclusions ¶ 28 ("The insured/borrower's name on said Premium Finance Agreement was Tommy Belville Trucking.").

frequently in default on their financing with Quality, which ultimately resulted in the repossession of the Equipment, and that they failed to properly maintain physical damage and liability insurance. TLB's theory of damages is that it could have effectuated a turnaround and would have developed equity in the Equipment had the Equipment been turned over at the outset of the bankruptcy case. Based on the evidence discussed below, however, the Court finds that even if TLB had provided Quality effective notice of its bankruptcy case, and even if the Equipment had been returned to TLB soon after the Petition Date, the payments necessary for TLB to obtain equity in the Equipment would not have been made.[21]

To establish the amount of equity it contends it would have had in the Equipment, TLB called Ms. Angell as an expert witness. According to Ms. Angell, the amount owing to Quality for the year 2008 and in each subsequent year until the debt was paid in full was approximately $480,000. *See* Tr. at 309:15–310:1; TLB Ex. 16 at 3. But according to Ms. Angell's own expert report, only $454,171.29 would have been available to make the required payments to Quality. *See* TLB Ex. 16, attachment 6. This means that, under Ms. Angell's own projections, TLB would have been $25,829 short on the payments owed to Quality in 2008. *See* TLB Ex. 16 at 3 ("[T]he total installment payments on the Agreements for the year 2008 were approximately $480,000.00, which demonstrates that there would have been a shortfall in the amount of $25,829.00 in cash flow...."). The shortfall would have been the same for 2009. *See* TLB Ex. 16, attachment 6. Ms. Angell took the position that the shortfall could have been satisfied through various restructuring efforts. *See* TLB Ex. 16 at 3 ("Although the total installment payments on the Agreements for the year 2008 were approximately $480,000.00, which demonstrates that there would have been a shortfall in the amount of $25,829.00 in cash flow, this problem would have been cured in [sic] through the reorganization of TLB doing business as Tommy Belville Trucking in the Chapter

---

21. TLB was provided the opportunity to inspect and did inspect the Equipment after the sale to Kirk Trucking. *See* General Joint Stipulations ¶¶ 38, 40. As already discussed, TLB filed an amended complaint seeking, in lieu of the return of the Equipment, actual and punitive damages for Quality's alleged violations of the automatic stay and the First Agreed Order. Perhaps in an attempt to explain this change in approach, Mr. Belville testified that, based on the inspection of the Equipment noted above, he believed that the Equipment was in "terrible shape" and would not have passed a State of Ohio truck inspection after having been used by Kirk Trucking. Tr. at 31:7. Indeed, Mr. Belville testified at great length to the effect that the Equipment was in worse shape after its use by Kirk Trucking than when it was repossessed from TLB. *See* Tr. at 31:8–95:8. The evidence, however, did not bear this out. Carl Kirk ("Mr. Kirk"), owner of Kirk Trucking, testified that his company spent considerable time and expense repairing the Equipment after its purchase from Quality and that the Equipment was in better condition when it was made available for inspection by TLB than when the Equipment was initially purchased by Kirk Trucking. *See* Tr. at 185:5–208:13. In addition, Steve Noel ("Mr. Noel"), the used truck manager at Glockner Chevrolet, evaluated the Equipment in May 2008 after it was repossessed and further examined the Equipment on or around September 1, 2008, after it was returned to Quality's lot from Kirk Trucking. Mr. Noel testified, also in contradiction of Mr. Belville's testimony, that the Equipment was "in much better condition" when it was returned by Kirk Trucking than after it was repossessed from TLB. *See* Tr. at 449:14–18. *See also* Tr. at 403:6–449:20. The Court finds the testimony of Mr. Kirk and Mr. Noel to be more credible than that of Mr. Belville and therefore finds that the Equipment was in better condition when it was returned by Kirk Trucking than after it was repossessed from TLB.

11 Bankruptcy.").[22] The evidence presented at trial, however, did not support Ms. Angell's view that TLB and its affiliated entity—Belville Trucking—would have been able to effectuate a turnaround that would have allowed the payments to be made to Quality going forward.

To support her opinion that TLB would have been able to make the necessary debt payments to Quality through the operation of the Equipment by Belville Trucking, Ms. Angell testified that a fuel surcharge went into effect for other coal haulers working for Medford Trucking in May 2008. According to Ms. Angell's report, if TLB had received this surcharge, it would have grossed an additional $13,860 per week, which would have "completely healed our TLB." TLB Ex. 16 at 4. Ms. Angell, however, was unable to provide any evidence that TLB would in fact have obtained such a fuel surcharge. *See* Tr. at 253:6–254:8; 317:10–318:18; 325:1–8. Furthermore, Ms. Angell's projected annual insurance expense of $39,085.71 for property and liability insurance for 2008, 2009 and 2010, *See* TLB Ex. 16, attachment 6, is too low. The Physical Damage Insurance had a six-month policy premium of $34,322. *See* Quality Ex. GGG. Thus, the yearly insurance cost for Physical Damage Insurance alone would be approximately $68,644. For the period September 2007 to September 2008, the premium for the Liability Insurance was $42,047. *See* Quality Ex. JJJ. Combined, the annual insurance costs for Physical Damage Insurance and Liability Insurance would total $110,691. Thus, Ms. Angell's projected annual insurance expense of $39,085.71 for insurance appears to be substantially understated, and the underestimation of insurance expenses resulted in an inaccurate—and unduly optimistic—prediction of TLB's future financial performance.

## IV. Legal Analysis

### A. Quality Is Not Liable for a Violation of the Automatic Stay

#### 1. Sale of the Equipment

██ TLB's right to redeem and thus obtain possession of the Equipment became property of its bankruptcy estate on the Petition Date. *See TranSouth Fin. Corp. v. Sharon (In re Sharon)*, 234 B.R. 676, 681–82 (6th Cir. BAP 1999).[23] And the Bankruptcy Code imposes an automatic stay of, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Thus, TLB contends that it is entitled to damages from Quality for its sale of the Equipment to Kirk Trucking after the Petition Date. As explained below, however, an entity—like Quality—that has neither notice nor knowledge of the commencement of a debtor's case at the time of the stay violation cannot be held liable for damages.

██ A provision added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") states as follows:

A monetary penalty may not be imposed on a creditor for a violation of a stay in effect under section 362(a) (including a monetary penalty imposed under section 362(k)) or for failure to comply with section 542 or 543 unless the conduct

---

22. As discussed above, the evidence at trial demonstrated that TLB and Belville Trucking are separate corporate entities and that Belville Trucking is not a fictitious name of TLB.

23. Under § 541(a)(1), the commencement of a bankruptcy case creates an estate comprised of, with exceptions not applicable here, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

that is the basis of such violation or of such failure occurs after such creditor receives notice effective under this section of the order for relief.

11 U.S.C. § 342(g)(2).[24] As the Court found above, Quality did not have effective notice of TLB's bankruptcy until it received a copy of the Section 341 Notice on May 7, 2008—after the sale to Kirk Trucking had been finalized. Under these circumstances, the Court could not impose a "monetary penalty" under § 362(k). *See 5th Ave. Real Estate Dev., Inc. v. Countrywide Home Loans, Inc. (In re 5th Ave. Real Estate Dev., Inc.),* 2008 WL 4371336 (Bankr.S.D.Fla. Sept. 19, 2008). This is because § 342(g)(2) expressly states that its prohibition on monetary penalties prior to effective notice of the order for relief "includ[es] a monetary penalty imposed under section 362(k)[.]" The language of § 342(g)(2) arguably is broad enough to cover monetary penalties for contempt under § 105(a), which is the relief that would be available to TLB (if it were entitled to any recovery) given that TLB is not an individual.[25] The Court, however, need not decide whether § 342(g)(2) should be construed so expansively, because TLB is not entitled to damages for contempt in any event. The Court's source of authority to levy sanctions for a violation of the automatic stay that injures a corporate entity is its general equitable powers under § 105(a) of the Code, which provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The party alleging contempt must show that the defendant had knowledge that the stay was in effect and nonetheless took an action in violation of the stay. Some courts have held that constructive knowledge can give rise to a finding of contempt, *see Elder–Beerman Stores Corp.,* 197 B.R. at 633, while others have required actual knowledge. *See Gunter,* 389 B.R. at 72.

Sixth Circuit case law holds that "[a] litigant may be held in contempt if his adversary shows by clear and convincing evidence that he violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *N.L.R.B. v. Cincinnati Bronze, Inc.,* 829 F.2d 585, 591 (6th Cir. 1987) (internal quotation marks omitted). "[T]he automatic stay is exactly the kind of 'definite and specific order of the court' contemplated by the Sixth Circuit." *Elder–Beerman Stores,* 197 B.R. at 633.

Based on its findings of fact set forth above, the Court concludes that TLB has not established by clear and convincing evidence—or even, for that matter, by a preponderance of the evidence—that Quality violated the automatic stay with notice or knowledge (either actual or constructive) of the existence of the stay. The Court, therefore, could not enter a monetary judgment in favor of TLB on account of the sale to Kirk Trucking even if Quality had proven that it had suffered any damages.

---

**24.** The commencement of a voluntary bankruptcy case constitutes an order for relief. *See* 11 U.S.C. § 301(b).

**25.** Section 362(k)(1) of the Bankruptcy Code provides that "an individual injured by any willful violation of the stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). Damages are not available under this section to corporations or other corporate entities such as TLB. *See Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc. (In re Elder–Beerman Stores Corp.),* 197 B.R. 629, 630–634 (Bankr.S.D.Ohio 1996) (applying 11 U.S.C. § 362(h), which was renumbered as § 362(k) with the enactment of BAPCPA).

### 2. Application of Funds to Claim Against Belville Trucking

The Bankruptcy Code also imposes an automatic stay of "any act to collect, assess, or recover a claim against a debtor that arose before the commencement of the case...." 11 U.S.C. § 362(a)(6). TLB contends that Quality violated this provision of the automatic stay by applying funds received from Rosemount to amounts owing under the Liability Premium Finance Agreement. *See* TLB Findings and Conclusions at 31.

 "Section 362(a)(6) ... affords protection to the debtor only and does not extend to third parties." *Universal Am–Can, Ltd. v. Nw. Steel & Wire Co.*, 2002 WL 88924, at *1 (N.D.Ill. Jan. 22, 2002). As the Court found above, the parties to the Liability Premium Finance Agreement were Quality and Belville Trucking; TLB was not a party to that agreement. Accordingly, the debt to which Quality applied funds was not TLB's, but instead was the debt of Belville Trucking, which is not a bankruptcy debtor. Furthermore, no evidence was presented showing that the funds in question belonged to TLB—rather than Belville Trucking—and thus were property of TLB's bankruptcy estate. The Court, therefore, concludes that TLB failed to establish that Quality violated the automatic stay when it applied the funds it received from Rosemount to Quality's claim against Belville Trucking.

### B. Quality Did Not Violate the First Agreed Order

 "An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation." *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995). The Court need not decide whether federal common law or Ohio law governing contract interpretation applies here, because the result under each is the same. The goal under both federal and Ohio law is to ascertain the parties' intent. *See FDIC v. AmTrust Fin. Corp. (In re AmTrust Fin. Corp.)*, 694 F.3d 741, 749–50 (6th Cir.2012) ("The goal of contract interpretation under the federal common law is to effect the intent of the parties.") (footnote omitted); *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St.3d 306, 875 N.E.2d 31, 33 (2007) ("When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement." (internal quotation marks omitted)). Under both federal common law and Ohio law, where a contractual provision is subject to two reasonable interpretations, the provision is ambiguous, and the court may look to the terms of the contract as well as additional evidence that reflects the intent of the parties. *See AmTrust Fin. Corp.*, 694 F.3d at 750 ("To determine [the parties'] intent, the law incorporates the traditional methods of contract interpretation. Where a contract's meaning is clear on its face, that meaning controls. Where a contractual provision is subject to two reasonable interpretations, however, that provision is deemed ambiguous, and the court may look to extrinsic evidence—additional evidence that reflects the intent of the contracting parties—to help construe it." (citations and internal quotation marks omitted)); *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 797 N.E.2d 1256, 1261 (2003) ("[W]here a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent."); *Look v. H & M Custom Home Builders Co.*, 2012 WL 2522647, at *3 (Ohio Ct.App. June 29, 2012) (holding that ambiguity exists if the meaning of contractual terms "cannot be deciphered from reading the entire instrument or if the terms are reasonably susceptible to more than one interpretation").

■ The First Agreed Order provided that TLB "shall provide proof of insurance to [Quality] *prior to* operation of [the Equipment] from place of pickup by [TLB] *or delivery by* [Quality]." *Id.* ¶ 8 (emphasis added). TLB makes much of the language in paragraph 8 of the First Agreed Order to the effect that proof of insurance shall be provided prior to operation of the Equipment from the place of pickup. *See* TLB Findings and Conclusions at 21–22. But in so doing TLB completely ignores the language of the order stating that proof of insurance shall be provided "prior to ... delivery by [Quality]." First Agreed Order ¶ 8. Based on the language of paragraph 8, the Court concludes that the parties' intent was that Quality would have no obligation to turn over the Equipment until after TLB furnished evidence of Physical Damage Insurance. Furthermore, no extrinsic evidence was presented during the trial that would lead the Court to conclude that the parties had a contrary intent.

As the Court found above, TLB never provided evidence of insurance, and Quality did nothing to cause the lapse or non-reinstatement of the Physical Damage Insurance that had been in place. The Court, therefore, concludes that TLB has not demonstrated that Quality violated the First Agreed Order.

## C. TLB Did Not Establish Damages

■ In this adversary proceeding, TLB seeks compensatory civil contempt damages. "A court may impose a fine, payable to the aggrieved party, as compensation for damages caused by the contemnor's actions," but the "amount of the fine must be based upon evidence of the actual loss suffered by the aggrieved party." *Thomasville Furniture Indus. v. Elder-Beerman Stores Corp.,* 250 B.R. 609, 620 (S.D.Ohio 1998) (citations omitted). Here, TLB not only failed to prove that Quality contemptuously violated the automatic stay, it also failed to present evidence of any actual loss it suffered.

■ The Court's findings regarding Ms. Angell's financial projections, including those related to the fuel surcharges and the underestimation of insurance expenses, demonstrate that TLB did not carry its burden of showing that the required payments to Quality would have been made. Thus, Quality failed to demonstrate *that it would have gained any equity in the* Equipment. In the Court's view, TLB's evidence of damages was both speculative and remote. "Damages must be proved, and not just dreamed...." *In re Nicole Energy Servs., Inc.,* 385 B.R. 201, 251 (Bankr.S.D.Ohio 2008) (quoting *Mind-Games, Inc. v. W. Publ'g Co.,* 218 F.3d 652, 658 (7th Cir.2000)). The Court, therefore, holds that, even if TLB had established Quality's liability for a violation of the automatic stay or the First Agreed Order, TLB would not be entitled to an award of damages for lost equity in the Equipment.[26]

---

26. In light of the need to properly allocate finite judicial resources to the many matters pending on the Court's docket, the time that has elapsed between the submission of this matter for decision and the issuance of the opinion was greater than usual and longer than the Court would have preferred. Yet because TLB had withdrawn its request for turnover of the Equipment, there was nothing that compelled the placement of this matter ahead of more pressing disputes—i.e., disputes whose resolution would materially advance the progress of an underlying bankruptcy proceeding. Perhaps as this adversary proceeding draws to a close it is apparent to TLB and counsel that this case was not one susceptible to reorganization. Indeed, that may well have been apparent shortly after the

## V. Conclusion

For the foregoing reasons, the Court finds that TLB is not entitled to a judgment, including any judgment for the loss of equity Equipment or for attorneys' fees and costs. Quality is entitled to a judgment in its favor on all counts of the Amended Complaint. The Court will enter a separate judgment in accordance with this memorandum opinion.

**IT SO ORDERED.**

case was filed given that approximately two months went by from the Petition Date until the time that TLB even sought turnover of the Equipment. Generally speaking, a Chapter 11 case will be successful under one of two scenarios. The first is if it is feasible for the debtor to gain confirmation of, and complete payments under, a Chapter 11 plan—an unlikely scenario here in view of the fact that, in the several months preceding the Petition Date, TLB had twice defaulted (once before and then immediately after Quality had refinanced TLB's secured indebtedness) on the obligation owed to its primary senior secured creditor and failed to maintain the required insurance covering both its own liability and physical damage to the Equipment. Second, a Chapter 11 filing is often made to enable a financially distressed business to effectuate a sale of its assets as a going concern. And in this case there has never been any suggestion that TLB explored the possibility of a prepeti-tion going-concern sale of its assets or sought the return of the Equipment in order to offer the assets for sale in the Chapter 11 case. Thus, there was no reasonable prospect of achieving either of the aims that are generally the impetus for a Chapter 11 filing. Rather, the Court is left with the impression—and this is merely an observation, not a finding of fact or conclusion of law, and does not form the basis for the Court's holding—that this adversary proceeding may have been viewed by the principal of TLB as an opportunity for a windfall rather than as a critical element of a reorganization or as a necessary prerequisite to the orderly sale of the Equipment. With the benefit of hindsight (and the Court recognizes—as the time-worn adage holds—that "hindsight is 20–20"), it appears that the Court's limited judicial resources have been expended on the adjudication of a dispute that should not have been litigated in a Chapter 11 case that should never have been filed.